**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRIAN CULLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | **Judge** |
| | ) | **Magistrate Judge** |
| **DELTA AIR LINES, INC.,** | ) | |
| | ) | **Jury Demand** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

For his Complaint against Defendant Delta Air Lines, Inc. ("Defendant"), Plaintiff Brian Cullen ("Mr. Cullen") states:

### I. PARTIES

1. Mr. Cullen is a citizen and resident of Murfreesboro, Tennessee, and a former employee of Defendant.

2. Defendant is a Delaware corporation with its principal place of business at 1030 Delta Boulevard, Department 982, Atlanta, Georgia 30354-1989. Defendant may be served with process through its registered agent, Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

### II. JURISDICTION AND VENUE

3. This is an action for equitable relief and damages for unlawful employment practices brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*. ("ADEA"). The Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1343(a)(4). Venue is proper under 28 U.S.C. § 1391 as Mr. Cullen lives and worked for Defendant within, and Defendant conducts business within, the Middle District of Tennessee.

4. Mr. Cullen has met all conditions precedent to the filing of this Complaint. He timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on July 4, 2025. The EEOC issued him a Notice of Right to Sue on February 20, 2026.

### III. FACTS

**A. Background**

5. Mr. Cullen is a 54-year-old male who worked for Defendant for nearly 29 years, from July 1, 1996, until it suspended him without pay on January 15, 2025, and then discharged him over nine weeks later, on March 24, 2025.

6. Mr. Cullen worked for Defendant at the Nashville International Airport ("BNA") as an Aircraft Load Agent ("ALA").

7. Mr. Cullen was qualified for his job with Defendant and performed it in an excellent manner. He never received any progressive disciplinary action or performance improvement plans before Defendant suspended and discharged him.

8. As further discussed below, Defendant has engaged in a pattern and practice of discriminating against and discharging older employees and replacing them with younger ones.

**B. January 15, 2025, Meeting**

9. On January 15, 2025, Defendant called Mr. Cullen and another ALA in his 50s, Brian Shelton, and another in his 60s, Kevin Neiswander, into a conference room separately to meet with Regional Manager Dustin Perry, two individuals from corporate security, and an investigator.

10. Defendant called Mr. Cullen into this meeting while he was in the middle of working a flight—not before or after one of his shifts or on one of his days off from work.

2

11. During the January 15, 2025, meeting, Defendant stated to Mr. Cullen that he "made a lot of money last year" and asked him what he was doing on the date of August 14, 2024—some five months earlier.

12. Neither Mr. Cullen nor any reasonable person could remember everything they did on one day five months earlier without an opportunity to review time records, calendars, or other documentation.

13. Defendant then stated that Mr. Cullen had gone to the employee parking lot at 11:58 p.m. on August 14, 2024, and was there for 25 minutes before he returned to the operations work area.

14. Mr. Cullen advised Defendant that, during that time period, he had been working 20-hour double shifts and had gone to his car to get a fresh change of clothes and some Gatorade.

15. Defendant then accused Mr. Cullen of not scanning in and out of work properly on three other dates in the summer and fall of 2024, and stated that he had bypassed security on those dates.

16. Defendant refused to provide Mr. Cullen any detailed information about these alleged infractions, even when he requested it.

17. Defendant's allegations were incorrect. Mr. Cullen went through security every day, typically between 3:00 a.m. and 4:00 a.m., unless he was working overnight.

18. Mr. Cullen had worked overnight on the dates that Defendant stated he bypassed security and/or had other justifications for doing so.

19. For example, BNA's security gates were frequently closed in the late evening and early morning hours.

20. When security was closed, Mr. Cullen and many other employees went through a guard shack gate at times to regain entry to work.

21. Mr. Perry stated to Mr. Cullen that the guard shack gate was not security.

22. Mr. Perry instructed Mr. Cullen to "write a statement" but to "keep it short."

23. Mr. Cullen complied and hand wrote a short statement on January 15, 2025.

24. Mr. Cullen was in shock at the time. He had worked for Defendant for nearly 29 years with no history of disciplinary action.

25. Before January 15, 2025, Mr. Cullen had not received any prior notice, warning, or other indication that he was doing anything incorrectly or improperly regarding security.

**C. January 15, 2025, Suspension Without Pay**

26. At the end of the January 15, 2025, meeting, Mr. Perry and Station Manager Vince Marsh took away Mr. Cullen's work badge, escorted him out of the building, drove him to his car, and gave him a letter stating that he was suspended without pay and placed on inactive employment status effective immediately.

27. Defendant took the same actions against Mr. Shelton.

28. Mr. Neiswander demonstrated that Defendant's allegations against him were false by showing that he was in Ohio on the days that it accused him of the violations.

29. Mr. Perry told Mr. Cullen that he could not talk to any employees while suspended except for Mr. Perry and Human Resources Representative Sarah Vazquez and that he would be terminated if he did.

30. Mr. Cullen remained suspended without pay for nearly 10 weeks with no communication from Defendant.

**D. March 24, 2025, Discharge**

4

31.    Over nine weeks after Defendant suspended him without pay, on March 24, 2025, Mr. Marsh and Operations Manager Zachery McCulley called Mr. Cullen and told him that Defendant had decided to terminate his employment.

32.    Defendant also provided Mr. Cullen a letter on March 24, 2025, confirming its decision to terminate his employment and purporting to give him the option to "retire."

33.    Defendant terminated Mr. Cullen's employment after over 28 years of excellent performance and service to it.

34.    Defendant also terminated Mr. Shelton.

35.    Defendant replaced Mr. Cullen with another individual in his 30s.

36.    Defendant also replaced Mr. Shelton with another individual in his 30s.

**E.     Pretextual Reason for Discharge**

37.    Defendant's alleged reason for suspending Mr. Cullen without pay on January 15, 2025, and discharging him on March 24, 2025—*i.e.*, bypassing security on certain dates in the summer and fall of 2024—is false and a pretext for age discrimination.

38.    Mr. Cullen did not violate Defendant's security policies or protocols.

39.    Defendant never provided Mr. Cullen any clear or specific explanation for his suspension and discharge or stated what specific policies or protocols he allegedly violated and how he had done so.

40.    Further, in 2024, OSM Justin Jordan sent an email to all staff stating as policy that if Defendant's employees did not possess or have liquids on their person, they did not have to go through security on a daily basis.

41.    OSM Erica Parsons printed this email and hung it in the break room at work for all of Defendant's employees to see.

42. BNA Station Manager Ty Alred also obtained a letter from Defendant's corporate security office in Atlanta, Georgia, stating that Defendant's employees including Mr. Cullen were in compliance with security regulations.

**1. Suspension and discharge were unreasonable and stated reason did not actually motivate those actions**

43. Defendant never questioned or stated anything to Mr. Cullen about the alleged security violations that allegedly occurred in the summer and fall of 2024 until months later, on January 15, 2025, when it abruptly suspended him from work without pay.

44. During the EEOC process months after it discharged him, Defendant identified five dates on which Mr. Cullen allegedly "bypassed employee screening": August 15, 2024 (Bypass door); September 17, 2024 (Bagroom turnstile); September 23, 2024 (Bypass door); October 1, 2024 (Bagroom turnstile); and November 8, 2024 (Bypass door).

45. Defendant had not previously provided Mr. Cullen this specific information. It also never provided him the specific times of day or night that he had allegedly bypassed security, or gave him a meaningful opportunity to respond before it discharged him.

46. Mr. Cullen had repeatedly asked Defendant during and around the January 15, 2025, suspension meeting for the dates and times on which he allegedly bypassed security and a complete list of his ID badge swipes into and out of the facility.

47. After it discharged him on March 24, 2025, Defendant increased the number of alleged security bypasses in the summer and fall of 2024 from four to five and changed the dates of other instances in which he allegedly did so.

48. Defendant misinterpreted Mr. Cullen's scanning in and out history and/or failed to properly record his departure and arrival times.

6

49.     Mr. Cullen never used the referenced "bagroom" and "bypass" doors before his actual work shift.

50.     When Mr. Cullen started his shift between 3:00 a.m. and 4:00 a.m., he always went through the employee screening line.

51.     On the dates at issue in the summer and fall of 2024, Mr. Cullen had good reasons to use the referenced doors, including working double shifts and in Operations at Defendant's direction, and also working late night / early morning "charter" and "ferry" flights when security was closed.

52.     From August through December 2024, Defendant's baggage handling department was very short staffed.

53.     From August through December 2024, there was a substantial increase in charter and ferry flights coming into and departing from BNA.

54.     From August through December 2024, Defendant only had six or seven qualified agents to cover the operations desk.  Two agents were on leave due to their spouses' medical conditions and a third was on leave due to an injury.

55.     Therefore, Operations Manager Zachery McCulley and James Jordan had Mr. Cullen work substantial amounts of overtime to help cover the operations desk.

56.     While working the operations desk, Mr. Cullen planned and processed the weight and balance of each flight, answered phones, communicated with gate and ramp agents and pilots, and assigned aircraft parking spots, among other tasks.

57.     During this time, Defendant's management asked Mr. Cullen to cover many extra shifts from 2:30 p.m. to closing, which was 12:00 a.m. or later, in addition to his own regular shift, which was from 4:00 a.m. to 12:30 p.m.

7

58. During this time, Mr. Cullen often worked until the last departure around 8:00 p.m. At times he worked even later, until the last arrival around 1:00 a.m.

59. For example, during the two-week period that included August 14, 2024, Mr. Cullen worked 149 hours.

60. This long work schedule required Mr. Cullen and other employees to spend many nights at BNA to make it to their next regular work shifts on time.

61. Many security gates were closed in the late evening and early morning hours.

62. Further, in the fall of 2024, there were many charter and ferry flights coming into and leaving from BNA during the late evening or early morning hours, when security was closed.

63. The fall of 2024 was the busiest charter and ferry flight season Defendant had ever had at BNA.

64. During the EEOC process, Defendant alleged that "no charter flights" were scheduled on the dates at issue in the summer and fall of 2024.

65. Even when no charter flights were scheduled, however, ferry flights came into and departed from BNA.

66. For example, if the Nashville Predators were departing two days later, an aircraft would fly into BNA the day before. This is called a ferry flight.

67. Defendant stated that there were no charter flights on October 12, 2024.

68. The Indianapolis Colts played in Nashville, however, on October 13, 2024. Mr. Cullen and others met with the Colts' travel staff on October 11, 2024, and the team flew into BNA on October 12, 2024. They departed from BNA on October 13, 2024.

69. In addition to the Tennessee Titans, Defendant also handled charter and/or ferry flights for the Nashville Predators and Vanderbilt University in the fall of 2024.

8

70. The Nashville Predators played the Detroit Red Wings in Detroit, Michigan, on October 12, 2024. Mr. Cullen and others stayed at BNA for the Predators' early morning arrival on October 13, 2024. They had to wait for maintenance and the plane to be cleaned and then started work at 3:30 a.m. or 4:00 a.m.

71. Regarding the bagroom doors, Mr. Cullen only used those doors when the oversized doors were out of service or when security was closed during the late evening and early morning hours.

72. When dropping off bags from a flight, Mr. Cullen occasionally had to transport weapons to the proper agent.

73. When transporting weapons, Mr. Cullen and other employees typically followed the normal process of using the oversized entry doors.

74. The oversized doors were broken and out of service for long periods of time in the summer and fall of 2024.

75. Thus, Mr. Cullen and other employees had to use the bagroom doors to gain access to the facility.

76. Regarding the bypass door, Mr. Cullen and other employees used it for various reasons, as well, including charter and ferry flight access and cargo access.

**2.    Stated reason was insufficient to motivate suspension and discharge**

77. Defendant treated Mr. Cullen differently and less favorably in the terms, conditions, and privileges of employment than similarly situated, substantially younger employees who did the same or very similar things that Defendant claims Mr. Cullen did and for which it suspended and discharged Mr. Cullen, but not those employees.

78.    For example, Defendant knew that numerous younger employees in Mr. Cullen's and other departments routinely made trips to the employee parking lot using the same exit and reentry process that Mr. Cullen used, without any consequence.

79.    Defendant also knew that its OSMs frequently parked outside the guard shack and drove in through that gate to access the operations area without ever going through security.

80.    Defendant was further aware that its OSMs entered the sterile area of the airport before going through security, all in violation of its alleged policy, which it has only selectively enforced.  None of the OSMs were discharged for their repeatedly failing to go through security.

81.    As. Mr. Cullen advised Defendant, on other occasions the OSMs parked in the cargo area; took company vehicles across the field to his work area; went to their offices; walked through the sterile concourse area; and then went through security.

82.    Defendant knew that OSMs frequently parked outside the guard shack and drove in through that gate without going through security.

83.    Defendant repeatedly warned, counseled, and disciplined younger employees when they engaged in conduct of comparable serious to that in which it contends Mr. Cullen and Mr. Shelton engaged, but did not suspend those employees without pay or discharge them.

84.    For example, Defendant repeatedly advised the OSMs that what they were doing violated company security policy and protocol, yet it never suspended the OSMs without pay or discharged them for bypassing security.

85.    Defendant also knew that its Aircraft Maintenance Team, parts employees, and the store department employees frequently bypassed security, yet it never suspended those employees without pay or discharged them for doing so.

10

86. Defendant knew that many other employees used the bagroom doors to access a public restroom on the baggage level, or to go to Green Beans Coffee near the C concourse inside BNA.

87. Defendant knew that many other employees frequently used company vans and trucks to go to the employee parking lot and to restaurants off of BNA property.

88. Defendant did not suspend the above-described employees without pay or discharge them.

89. Defendant has alleged that it discharged a younger employee, Isaiah Thomas, in August 2024 and that, during his appeal process, Mr. Thomas claimed that Mr. Cullen and three other frontline employees had bypassed security screening.

90. Mr. Thomas, however, had bypassed security approximately 18 times in 40 days.

91. Mr. Thomas did not have any reasonable justification for bypassing security.

92. Mr. Thomas did not work charter or ferry flights when he bypassed security.

93. Mr. Thomas did not work in operations when he bypassed security.

94. Mr. Thomas did not work the double and longer shifts that Mr. Cullen worked in the summer and fall of 2024 when Mr. Thomas bypassed security.

95. Mr. Thomas also had many attendance policy violations, which Mr. Cullen did not have.

96. Defendant has alleged that it terminated three other employees for bypassing security.

97. These three employees repeatedly bypassed security by using the bagroom door on Level 2 of BNA.

98. All three of these employees were short-time or junior-level employees.

99.     Unlike Mr. Cullen, none of these three employees worked charter and ferry flights, operations, or excessive amounts of overtime at Defendant's direction when they bypassed security.

100.     One of these three employees had only worked for Defendant for approximately one month and was still a probationary employee.

101.     Another of these three employees had worked for Defendant for approximately nine or 10 months and had documented performance issues.

102.     Another of these three employees had worked for Defendant for approximately three and one-half years and had repeated and many attendance policy violations.

103.     Many younger employees of Defendant frequently did what Defendant claims Mr. Cullen and Mr. Shelton did, yet Defendant did not suspend those employees without pay and discharge them for doing so.

104.     Defendant targeted, suspended, and discharged older employees for allegedly doing the same things that younger employees frequently did without any consequence.

### IV. CAUSE OF ACTION

105.     Mr. Cullen incorporates all of the paragraphs above as if fully stated below.

106.     As described above, Defendant discriminated against Mr. Cullen in the terms, conditions, and privileges of employment, suspended him without pay, discharged him, and failed and refused to retain him as an employee in any capacity because of his age, in violation of the ADEA.

107.     Defendant's conduct as described in this Complaint was willful, entitling Mr. Cullen to liquidated damages.

12

108.    As a direct result of Defendant's discriminatory conduct, Mr. Cullen has been harmed and suffered damages.

109    As a direct result of Defendant's discriminatory conduct, Mr. Cullen has lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and incurred attorneys' fees, costs and litigation expenses.

## V. RELIEF REQUESTED

WHEREFORE, Mr. Cullen respectfully requests:

1.    A jury trial;

2.    Back pay and damages for lost benefits;

3.    Compensatory damages;

4.    Reinstatement or, alternatively, front pay and damages for lost benefits;

5.    Liquidated damages;

6.    Attorneys' fees, costs and litigation expenses;

7.    Prejudgment interest and, if applicable, post judgment interest; and

8.    Such other and further legal or equitable relief to which he may be entitled.

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (TN BPR No. 19112)
Law Office of Douglas B. Janney III
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

Attorney for Plaintiff

13